**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

---

**REYNA ANGELES ACOSTA**,

    Plaintiff,

v.

**MENESES LAW, PLLC**, a Texas
Professional Limited Liability Company;
**MENESES ENTERPRISES, LLC**, a
Limited Liability Company;
**FRANCES CHRISTINE MENESES**,
an individual; and **JULIO CARLOS
MENESES**, an individual; and
**ROBERT VICTOR TORREY**, an
individual;

    Defendants.

Case No. _____

Hon. _____

---

## <u>PLAINTIFF'S CLASS ACTION COMPLAINT AND JURY DEMAND</u>

This is a class action brought by Plaintiff Reyna Ángeles Acosta ("Plaintiff" or "Acosta"), individually and on behalf of all others similarly situated, against Defendants Meneses Law, PLLC ("Meneses Law"), Meneses Enterprises, LLC ("Meneses Enterprises"), Frances Christine Meneses ("Frances Meneses"), Julio Carlos Meneses ("Julio Meneses") and Robert Victor Torrey ("Torrey"), an attorney licensed in Texas who served as the signing attorney and preparer-certifying attorney of record on Plaintiff Acosta's Form I-360 VAWA self-petition (collectively, "Defendants"), for fee disgorgement, restitution, and damages arising from Defendants' systematic scheme to defraud vulnerable immigrants through a high-volume

immigration filing operation disguised as a legitimate law practice.

Meneses Law operated as a high-volume VAWA (Violence Against Women Act) filing mill, processing hundreds if not thousands of immigration petitions through a standardized, assembly-line system designed to maximize revenue while minimizing meaningful legal representation. The firm's entire business model was built upon concealment, fabrication, and the systematic exploitation of vulnerable, predominantly Spanish-speaking immigrants who were desperate to obtain legal status in the United States.

This enterprise operates through a coordinated network of attorneys and non-attorney staff using standardized, high-volume processes to manufacture false abuse narratives, obtain client signatures without informed consent, and submit false immigration filings to USCIS under penalty of perjury. This assembly-line model was not independently conceived. It was deliberately copied from attorney Alexandra Lozano's business model, a competing firm that pioneered the departmentalized, high-volume VAWA filing structure and marketed it to Spanish-speaking immigrants under its trademarked slogan "*Arreglar Sin Salir*" (or the "*A.S.S.*" business model) promising clients they could obtain residency without departing the United States. Meneses Law has acknowledged in prior litigation that it recruited and installed Lozano's former Senior Operations Manager to architect its own operations, hired additional Lozano personnel, and adopted Lozano's proprietary marketing phrase verbatim. In replicating *Lozano's A.S.S. operation*, Defendants imported not only Lozano's organizational template, but its most dangerous feature: the capacity to certify and submit mass immigration filings, including filings based on fabricated and completely false abuse narratives, under an attorney's signature, without meaningful attorney-client contact or individualized eligibility review.

Plaintiff is one of hundreds if not thousands of victims of a repeatable and scalable system designed not to evaluate eligibility, but to produce filings that appear to satisfy VAWA criteria regardless of the underlying facts. This enterprise did not depend on the truth of client experiences, but on the consistent construction of narratives sufficient to support immigration filings and generate revenue.

## I.    NATURE OF THE ACTION

1.    This class action does not seek to determine whether any individual VAWA filing was meritorious. Rather, the class challenges the uniform system through which Defendants processed every client: the concealment of the true nature of VAWA petitions, the use of non-attorney staff to conduct all substantive client interactions, the fabrication and exaggeration of declarations by employees who never spoke with the clients, the unauthorized use of digitized signatures without meaningful review, the absence of attorney oversight at every critical stage, and the retention of substantial fees for services that were fundamentally compromised by systemic breaches of fiduciary duty.

2.    Under Texas law, fee forfeiture does not require proof of actual damages to the client. In Burrow v. Arce, 997 S.W.2d 229, 240 (Tex. 1999), the Texas Supreme Court held that a client need not prove actual damages to obtain fee forfeiture when the attorney has committed a clear and serious breach of fiduciary duty. The focus of the inquiry is on the attorney's disloyalty, not the client's loss. This principle is the legal cornerstone of the class claims asserted herein.

3.    The class theory is based on Defendants' uniform process, not on the immigration outcomes of individual class members. Even if some class members had valid VAWA

claims, and even if some filings were ultimately approved, the systematic process breaches described herein independently warrant complete fee disgorgement under Texas fiduciary duty law.

4.    Named Plaintiff Acosta is one of hundreds, if not thousands, of individuals processed through Defendants' version of Lozano's A.S.S. operation and standardized system. Like other class members, she was targeted through Spanish-language social media advertising, subjected to a scripted intake process conducted entirely by non-attorney staff, never informed that she was being enrolled in a VAWA petition, never spoke with an attorney, had a declaration drafted by a "creative writer" who never spoke with her, was rushed into electronically signing documents she could not read, and was charged thousands of dollars for what amounted to an assembly-line product devoid of individualized legal judgment.

5.    Defendants' scheme was not an isolated failure of professional responsibility. It was a deliberate, profit-driven enterprise designed to exploit the intersection of immigration desperation and legal complexity. Defendants knew that their predominantly undocumented, Spanish-speaking clients would be unlikely to discover the true nature of the filings made on their behalf, unlikely to understand the legal and criminal consequences of those filings, and unlikely to have the resources or knowledge to seek recourse.

6.    The scheme generated enormous revenue. Defendants charged each client between $13,550 and $25,000 or more in fees. With hundreds if not thousands of clients processed through the same system, Defendants collected millions of dollars every month while

providing a standardized product that bore no resemblance to competent, individualized legal representation.

7. Defendants' conduct constitutes, at minimum: (a) breach of fiduciary duty warranting fee forfeiture under *Burrow v. Arce* and unjust enrichment (pleaded in the alternative); and (b) a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968.

8. Plaintiff brings this action on behalf of herself and all others similarly situated to recover all fees paid to Defendants, to obtain treble damages under RICO, to obtain exemplary damages, and to secure injunctive and declaratory relief to prevent Defendants from continuing their scheme and to protect class members from retaliation or adverse immigration consequences arising from their participation in this litigation.

9. Plaintiff seeks certification of a class and subclasses under Federal Rule of Civil Procedure 23(a), 23(b)(3), and, in the alternative, and 23(c)(4).

10. Plaintiff asserts five causes of action: (1) Breach of Fiduciary Duty and Fee Forfeiture under *Burrow v. Arce*; (2) Unjust Enrichment/Money Had and Received, pleaded in the alternative; (3) Civil RICO under 18 U.S.C. § 1962(c); (4) RICO Conspiracy under 18 U.S.C. § 1962(d) and (5) Texas Deceptive Trade Practices Act under Tex. Bus. & Com. Code §§ 17.41–17.63.

## II.   JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) because Plaintiff's claims arise under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968.

12. This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because: (a) the proposed class contains more than 100 members; (b) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (c) at least one member of the proposed plaintiff class is a citizen of a state or foreign country different from at least one defendant.

13. Plaintiff Reyna Ángeles Acosta is a citizen of Mexico domiciled in Austin, Travis County, Texas.

14. Defendant Meneses Law, PLLC is a Texas Professional Limited Liability Company with its principal place of business in Houston, Harris County, Texas. It is a citizen of Texas for purposes of diversity jurisdiction.

15. Defendant Meneses Enterprises, LLC is a Texas Limited Liability Company with its principal place of business in Houston, Harris County, Texas. Upon information and belief, its members are Frances Christine Meneses and Julio Carlos Meneses, both citizens of Texas.

16. Defendant Frances Christine Meneses is an individual and citizen of the State of Texas.

17. Defendant Julio Carlos Meneses is an individual and citizen of the State of Texas.

18. Minimal diversity exists under 28 U.S.C. § 1332(d)(2)(B) because Plaintiff is a citizen of Mexico and Defendants are citizens of Texas.

19. Venue is proper in the Southern District of Texas pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because Defendants reside in this judicial district and a substantial part of the events or omissions giving rise to the claims occurred in this district, including Defendants' principal business operations, marketing activities, client intake, document

preparation, and USCIS filings.

20. This Court has personal jurisdiction over all Defendants. Meneses Law, PLLC and Meneses Enterprises, LLC are organized under Texas law and maintain their principal places of business in this district. Frances Christine Meneses and Julio Carlos Meneses are domiciled in Texas and conducted the acts giving rise to this action in this district.

21. Defendant Robert Victor Torrey is an attorney licensed to practice law in the State of Texas and is a citizen of the State of Texas. He is, or at times relevant herein was, associated with or retained by Meneses Law, PLLC to serve as a nominal filing attorney. He executed filings with the United States Citizenship and Immigration Services in connection with this matter and others during the class period, all from within this judicial district or in connection with Meneses Law's operations in Harris County, Texas.

22. Intradistrict assignment to the Houston Division is proper under Local Rule 4 because a substantial part of the events or omissions giving rise to the claims occurred in Harris County, Texas.

## III.    PARTIES

23. Plaintiff Reyna Ángeles Acosta is a natural person and citizen of Mexico who is domiciled in Austin, Travis County, Texas. She is a single mother whose adult son, Giovanni, is a United States citizen over the age of twenty-one.

24. Acosta retained Meneses Law on or about September 23, 2024, after responding to Spanish-language social media advertisements. She paid an initial down payment of $3,550 toward a total fee of $14,500 and made ongoing monthly payments of $500. She was processed through Defendants' standardized system and, like other class members,

was never informed that she was being enrolled in a VAWA petition, never spoke with an attorney, and had documents filed on her behalf containing material exaggerations and falsehoods.

25. Defendant Meneses Law, PLLC is a Texas Professional Limited Liability Company that holds itself out as an immigration law firm. Its registered address is 4800 W. 34th Street, Suite A15, Houston, Texas 77092. Meneses Law was the entity that entered into representation agreements with Plaintiff and class members, collected fees, and filed immigration petitions with USCIS.

26. Defendant Meneses Enterprises, LLC is a Texas Limited Liability Company formed on November 14, 2023, with a registered address at 2900 North Loop West, Suite 300, Houston, Texas 77092. Upon information and belief, its managers are Julio Carlos Meneses and Frances Christine Meneses. Meneses Enterprises has no apparent connection to the provision of legal services, was formed during the period of the alleged fraudulent conduct, shares management and address with Meneses Law, and, upon information and belief, served as a vehicle for the receipt and concealment of proceeds derived from Defendants' scheme. Plaintiff alleges that Meneses Enterprises is the alter ego and instrumentality of the individual Defendants and/or Meneses Law.

27. Defendant Frances Christine Meneses is an attorney licensed to practice law in the State of Texas. She is the owner, sole or principal member, manager, and supervising attorney of Meneses Law, PLLC. Frances Meneses designed, implemented, and directed the policies, procedures, scripts, quotas, and systems that constitute the wrongful conduct alleged herein. She is personally liable for the breaches of fiduciary duty, deceptive trade

practices, and racketeering activity described in this Complaint.

28. Defendant Julio Carlos Meneses is the Vice President of Meneses Law, PLLC and a co-manager of Meneses Enterprises, LLC. Upon information and belief, Julio Meneses is involved in the day-to-day operations of Meneses Law, including decision-making, personnel management, financial oversight, and the implementation of the policies and systems described herein. He is personally liable as a co-conspirator and participant in the wrongful conduct alleged in this Complaint.

29. Defendant Robert Victor Torrey is an attorney licensed to practice law in the State of Texas. At all times relevant to this Complaint, Torrey served as a nominal signing attorney for Meneses Law, PLLC. In that capacity, Torrey executed Form G-28 Notices of Entry of Appearance as Attorney, a federal filing that designates an individual as the attorney of record for a specific client before USCIS, and signed the preparer's certification on Form I-360 VAWA self-petitions filed on behalf of Plaintiff Acosta and, upon information and belief, a substantial number of other class members.

30. By executing the G-28 and the preparer's certification, Torrey voluntarily represented to USCIS and to each petitioner: (a) that he was the attorney of record responsible for the representation; (b) that he had personally prepared each petition; and (c) that he had obtained the petitioner's verification that the information in the petition was complete, true, and correct.

31. Each of these representations was false. Torrey did not prepare Acosta's petition, did not review the declaration filed on her behalf, and never communicated with Acosta in any way. Under Texas law, the attorney-client relationship, and the fiduciary duties that attend

it, arose from Torrey's voluntary undertaking of these responsibilities, not from any formal retainer agreement.

## IV.    STATUTORY AND REGULATORY FRAMEWORK

### A.    The Violence Against Women Act Self-Petition Process

32.    The Violence Against Women Act ("VAWA"), originally enacted in 1994 and reauthorized multiple times, provides a pathway for certain abused immigrants to self-petition for immigration benefits without the knowledge or consent of their abuser. VAWA self-petitions are filed using USCIS Form I-360.

33.    VAWA self-petitions are available to spouses, children, and parents of abusive U.S. citizens or lawful permanent residents. Under INA § 204(a)(1)(A)(iii), a parent of a U.S. citizen son or daughter who is twenty-one years of age or older may self-petition if the parent demonstrates that he or she has been battered or subjected to extreme cruelty by the U.S. citizen son or daughter.

34.    The parent-based VAWA self-petition requires the petitioner to establish: (a) a qualifying relationship with a U.S. citizen son or daughter over age twenty-one; (b) that the petitioner resided with the abusive son or daughter; (c) that the petitioner was subjected to battery or extreme cruelty perpetrated by the U.S. citizen son or daughter; (d) that the petitioner is a person of good moral character; and (e) that the petitioner resides in the United States.

35.    The terms "battery" and "extreme cruelty" in the VAWA context encompass a broad range of conduct, including but not limited to physical violence, threats of violence, emotional abuse, economic abuse, isolation, and other forms of coercive control. USCIS applies a

liberal standard, accepting "any credible evidence" to support the petition.

36.     The "any credible evidence" standard, codified at 8 C.F.R. § 204.2(c)(2)(i), was designed to account for the unique evidentiary challenges faced by abuse victims. However, this same standard creates a significant vulnerability to exploitation because USCIS will credit a wide range of evidence, including the petitioner's own declaration, unscrupulous practitioners can fabricate or grossly exaggerate claims of abuse with a reasonable expectation that the petition will be approved based on the declaration alone.

37.     Upon approval of a VAWA self-petition, the petitioner becomes eligible for deferred action status and employment authorization (a work permit) which can usually arrive within a few months. For many undocumented immigrants, the work permit alone represents an enormously valuable and immediate benefit, making the prospect of a VAWA filing extremely attractive regardless of its underlying merit.

38.     The combination of the "any credible evidence" standard, the immediate tangible benefit of employment authorization, and the desperation of undocumented immigrants creates a system that is uniquely susceptible to exploitation by high-volume practitioners willing to fabricate or exaggerate claims of abuse.

### B.     Federal Consequences of False Filings

39.     Filing a materially false VAWA self-petition exposes the petitioner to severe federal criminal consequences. Under 18 U.S.C. § 1546(a), any person who knowingly makes a false statement in an immigration document faces imprisonment of up to ten years (or up to fifteen years if committed to facilitate drug trafficking or twenty-five years if committed to facilitate terrorism).

40.     A false VAWA filing also exposes the petitioner to removal proceedings, bars to future immigration benefits, and potential criminal prosecution for immigration fraud under 18 U.S.C. § 1015 and other federal statutes. These consequences fall not on the attorney who fabricated the declaration, but on the immigrant petitioner who signed it.

41.     Defendants' clients, predominantly undocumented, Spanish-speaking immigrants with limited education and no familiarity with the American legal system, were uniquely vulnerable to these consequences. They trusted that their attorneys were filing truthful petitions on their behalf and had no way of knowing that the declarations contained fabrications or exaggerations.

### C.     The VAWA Abuse Crisis

42.     In December 2025, federal authorities reported that VAWA self-petition filings had increased by approximately 360% over the preceding period. This extraordinary surge has drawn scrutiny from USCIS, Congress, and federal law enforcement, and has been attributed in significant part to high-volume filing operations like Meneses Law that systematically manufactured abuse claims to generate fees.

43.     The surge in fraudulent VAWA filings has profound consequences beyond the individual petitioners. It undermines the integrity of the VAWA program, diverts limited USCIS resources from legitimate abuse victims, and exposes hundreds or thousands of immigrant petitioners to criminal liability for filings they did not understand and did not knowingly authorize.

**D.     Statute of Limitations**

44.     The applicable limitations period is:

    a.  RICO's four-year limitations period under Agency Holding Corp. v. Malley-Duff, running from the date of injury discovery;

    b.   Texas's four-year period for breach of fiduciary duty;

    c.  fraudulent concealment tolling, defendants deliberately concealed the nature of the filings by prohibiting staff from using the word "VAWA," preventing class members from discovering the cause of action; and

    d.  Under *American Pipe & Construction Co. v. Utah*, tolling for class members from the date of filing

**V.     FACTUAL ALLEGATIONS**

**A.     The VAWA Mill System**

45.     Meneses Law operated a systematic, high-volume VAWA filing operation akin to Lozano's A.S.S. operation, designed to maximize the number of I-360 petitions filed and fees collected while minimizing the time, cost, and professional judgment devoted to each case.

46.     Meneses' A.S.S. operation was uniform: every client, regardless of individual circumstances, was processed through the same pipeline. The following paragraphs describe each stage of that pipeline.

47.     *Marketing and Client Acquisition.* Defendants conducted an aggressive, high-volume marketing campaign targeting Spanish-speaking immigrants through social media platforms, particularly Facebook, Instagram, TikTok, and YouTube. Upon information

and belief, Defendants produced and disseminated more than 1,300 videos in Spanish, many featuring Frances Meneses or staff members, promising immigration solutions and using taglines such as "we say yes when others say no" and similar representations designed to appeal to immigrants who had been told by other attorneys that they had no viable immigration options.

48.    The marketing materials were carefully crafted to avoid any mention of VAWA, domestic violence, or abuse. Instead, they described Meneses Law's services in vague terms that suggested the firm could help individuals with U.S. citizen family members obtain legal status through family-based petitions.

49.    The advertisements specifically targeted individuals with prior deportations, removal orders, or other immigration barriers, promising that the firm could help "even if others have said no."

50.    The marketing campaign was designed to generate a high volume of leads that would be funneled into the standardized intake pipeline described below.

51.    The foregoing fraudulent marketing scheme was materially advanced by the deliberate publication of false statistical claims via interstate social media wires. On or about November 12, 2025, Defendant Frances Meneses published and promoted a video through Meneses Law's TikTok social media account targeting Spanish-speaking immigrant communities. In the video, Meneses made the following statements in Spanish, which translate as follows:

"[USCIS] Immigration has published that **91% to 92% of VAWA cases have been approved** in recent years. And with that, what does that mean compared to other types of cases? The U visa, the T visa, have a 50% chance of winning. 50%! Listen to that. We, our team has been united with our clients to help them obtain their residency and we have received VAWA results that speak for themselves. If you are married to an American citizen or resident or have children over

21 years of age who are American citizens, we can help you fix your status from here without leaving through the VAWA law. Don't be deceived! Call us for information and make sure you get legal advice from an immigration attorney who knows how to handle these cases. Call us!!!" (emphasis added)

52.    Each material statistical and factual representation in this video was false.

53.    The 91–92% approval rate claim is not supported by any USCIS publication.

54.    USCIS publishes quarterly and annual performance data for Form I-360 VAWA self-petitions broken down by petition category.

55.    That data, the only source Meneses could have intended by her attribution to "Inmigración" shows that for Fiscal Year 2021, the approval rate for spouse-based VAWA petitions was approximately 70% (6,412 approvals out of 9,124 adjudicated petitions).

56.    For child-based VAWA petitions the approval rate was approximately 42%.

57.    For parent-based VAWA petitions under INA §204(a)(1)(A)(iii), the precise petition category primarily marketed to audiences like Plaintiff Acosta, the USCIS-published approval rate was approximately 23%.

58.    No USCIS dataset, annual report, or quarterly performance publication contains or supports a 91% to 92% approval figure for VAWA I-360 petitions of any category.

59.    The video's express attribution of this figure to "Inmigración", a term understood by the target audience to mean the U.S. federal immigration agency, constitutes a false designation of source designed to lend governmental authority to a fabricated statistic.

60.    Even if the 91–92% figure were derived from some proprietary "firm success rate" calculation, its publication to parent-based petition prospects was independently misleading.

61.    Defendants' marketing was directed at the same immigrant community, largely mothers

and fathers of adult U.S. citizens, whose cases fell in the parent-based category.

62. Presenting even a hypothetically accurate spousal approval figure to a parent-category audience misrepresents the actual probability of success for the service being sold.

63. Because parent-based VAWA requires establishing that a U.S. citizen child over age 21 was the perpetrator of battery or extreme cruelty against a parent, a factual scenario USCIS scrutinizes with heightened skepticism, the published 23% approval rate for this category is the only statistically honest figure that could have been stated for this audience.

64. Parent-based VAWA filing volume had surged 2,239% between Fiscal Year 2020 and Fiscal Year 2024 according to USCIS data, a period coinciding with the operation of VAWA Mill enterprises including Defendants' enterprise.

65. USCIS has publicly identified this surge as a trigger for enhanced fraud-detection scrutiny and has formally reported rampant fraud within the program. See USCIS Alert, December 2025 - "USCIS Restores Integrity to the VAWA Domestic Abuse Program After Finding Rampant Fraud."

66. The increased denial rates associated with this scrutiny period made the 91–92% claim even more disconnected from reality at the moment it was broadcast.

67. The claim that U visa petitions carry a "50% chance of winning" is false and misleading.

68. The U nonimmigrant visa carries a statutory cap of 10,000 principal visas per fiscal year. See 8 U.S.C. §1184(p)(2).

69. In Fiscal Year 2024, USCIS received 41,556 principal U-1 petitions while remaining constrained to that 10,000-visa annual ceiling.

70. As of that same period, over 249,000 petitions remained in the adjudication backlog, with estimated wait times exceeding fifteen years.

71. The U visa's practical limitation is not applicant merit but a fixed numerical allocation determined by Congress.

72. Characterizing U visa prospects as carrying a "50% chance of winning" fundamentally misrepresents how U visa adjudication operates and was calculated to make VAWA appear uniquely superior to a competing humanitarian remedy in the eyes of the immigrant audience.

73. The claim that T visa petitions carry a "50% chance of winning" is similarly false.

74. T nonimmigrant status is available to victims of severe forms of trafficking in persons.

75. USCIS historical merit-based approval rates for adjudicated T visa petitions (Form I-914) have substantially exceeded 50%.

76. Meneses's characterization does not correspond to any published USCIS data and was made without factual basis.

77. The unconditional "without leaving" promise was false for a large segment of the target audience.

78. Individuals with prior orders of removal, prior unlawful entries, prior deportations, or independent grounds of inadmissibility under INA §212 cannot automatically regularize their status through VAWA approval alone.

79. VAWA self-petition approval establishes a basis for adjustment of status, but does not independently waive bars to adjustment that may apply under 8 U.S.C. §1182(a).

80. Defendants knew or recklessly disregarded that a significant portion of the undocumented

immigrant community they were targeting faced exactly these additional hurdles, yet the video promised, without qualification, that the listener could "fix your status from here without leaving."

81. The November 12, 2025 TikTok video was transmitted via interstate electronic wire to a social media audience accessible across the United States and constituted a material false and misleading commercial solicitation made in connection with the sale of Defendants' immigration legal services.

82. *Sales Representatives ("Licenciadas")*. Defendants employed non-attorney sales representatives, referred to internally and externally as "licenciadas." The term "licenciada" (feminine form of "licenciado") is a formal honorific used throughout Latin America (including Mexico, El Salvador, Guatemala, Honduras, and other countries of origin common to Defendants' client base) to denote a person holding a university degree or professional license, and is specifically and commonly used to refer to attorneys and other licensed legal professionals.

83. In the immigrant communities Defendants targeted, being introduced to a "licenciada" at a law firm carried the unmistakable implication of speaking with a lawyer. Defendants selected and used this title deliberately, not as an internal shorthand, but as a client-facing representation designed to induce prospective clients to believe they were receiving legal advice from qualified legal professionals.

84. These sales representatives were not U.S. licensed attorneys in any jurisdiction, were not enrolled in law school, and had no formal legal training.

85. They were not paralegals operating under meaningful attorney supervision. They were

sales employees. The use of the title "licenciada" to describe them to Spanish-speaking clients was a deliberate misrepresentation of professional status, calculated to induce retention and fee payment.

86.    The "licenciadas" operated under a dual compensation structure: an hourly base rate supplemented by a per-client commission paid upon each new client retention. They were subject to performance quotas requiring them to close (have the client retain the firm) approximately thirty clients per month per licenciada.

87.    Sales representatives who failed to meet quotas were subject to discipline and termination. This commission-and-quota structure created powerful and direct financial incentives to enroll as many clients as possible, regardless of whether the client had any qualifying basis for a VAWA petition, regardless of whether the client understood what was being filed on their behalf, and regardless of the criminal exposure created by a false filing.

88.    The licenciadas were not evaluating legal merit, they were closing sales. Upon information and belief, Defendants' internal communications, HR records, and payroll data will confirm both the commission structure and the quota requirements, and will identify each licenciada employed during the class period, the number of clients each enrolled, and the commissions each earned. Each commission payment received by a licenciada in connection with a fraudulent enrollment constitutes a predicate act in furtherance of the enterprise's racketeering activity.

89.    *Concealment of VAWA*. The licenciada deception was not an isolated practice, it was the first layer of a multi-layered concealment scheme. Defendants implemented a deliberate

policy of concealing the true nature of the immigration petition being filed on clients' behalf.

90. Sales representatives and other non-attorney staff were expressly prohibited from using the term "VAWA" or explaining that the petition involved allegations of domestic violence or abuse.

91. Instead, staff were instructed to refer to the filing as a "360," an "I-360 family petition," or similar terms designed to obscure the nature of the filing.

92. This concealment was not incidental or the result of staff ignorance. It was a deliberate, top-down policy implemented by Frances Meneses and enforced through supervision and termination.

93. The concealment served a critical business function: if clients understood that they were being enrolled in a petition alleging that their own family members had abused them, many would refuse to proceed. The concealment ensured client retention and fee collection.

94. *Standardized Retainers*. Defendants used standardized retainer agreements that identified the matter only by form number (e.g., "I-360") without disclosing that the petition was a VAWA self-petition involving allegations of abuse.

95. The retainers did not explain the nature of VAWA, the elements required to be proven, the allegations that would be made, or the potential consequences of filing a false petition.

96. The retainers were presented in English to predominantly Spanish-speaking clients without adequate translation or explanation.

97. *Non-Attorney Intake*. All substantive client intake was conducted by non-attorney staff

members.

98. During intake, the staff member would interview the client using a structured questionnaire designed to elicit facts that could be recharacterized as abuse.

99. The intake interviews typically lasted thirty to forty-five minutes and were conducted by telephone.

100. No attorney participated in, supervised, or reviewed the intake process.

101. The intake process was designed to identify and extract facts from the client's life that could be repurposed as evidence of abuse, regardless of the client's own characterization of those facts. Normal family stressors such as a child's late work hours, financial disagreements, and emotional distance, were systematically reframed as "emotional abuse," "economic abuse," or "extreme cruelty" by staff members following scripted protocols.

102. *Creative Writers*. After intake, the client's file was transferred to a separate department of employees referred to internally as "creative writers."

103. The creative writers had no direct contact with clients. Their function was to take the raw notes from the intake interview and transform them into a detailed personal declaration suitable for submission with a VAWA I-360 petition.

104. The creative writers fabricated, exaggerated, and recharacterized facts to construct narratives of abuse that met VAWA's legal standards.

105. Routine family disputes were transformed into patterns of emotional abuse. Expressions of parental concern were rewritten as evidence of coercive control.

106. In many cases, the declarations included allegations that were entirely fabricated with

events that never occurred, statements that were never made, and patterns of conduct that bore no resemblance to the client's actual experience.

107. The creative writers operated without any client verification process.

108. The declarations they produced were not reviewed with the client, were not read back to the client, and were not provided to the client in Spanish or any language the client could understand prior to signature.

109. *Absence of Attorney Involvement*. No attorney at Meneses Law conducted a substantive interview with any client, reviewed the accuracy of any client declaration prior to filing, provided legal advice to any client regarding the nature or consequences of a VAWA filing, or exercised independent professional judgment regarding the merits or strategy of any individual case.

110. The attorneys whose names appeared on filed petitions, including Defendant Robert Victor Torrey with respect to Plaintiff Acosta's petition and, upon information and belief, additional attorneys whose identities will be established through discovery for other class members, served as nominal signatories. These attorneys did not meet with clients, did not review declarations prior to filing, and did not exercise the independent professional judgment that the attorney-client relationship requires.

111. They did not meet with clients, did not verify the accuracy of declarations, and did not exercise the independent professional judgment that is the hallmark of attorney-client representation.

112. *Digitized and Copy-Paste Signatures*. Defendants obtained client signatures on declarations and other critical documents through a process designed to prevent

meaningful review.

113. Clients were called, often while at work or otherwise occupied, and rushed through a signing process that lasted five to ten minutes.

114. During these brief calls, documents were presented in English to Spanish-speaking clients without translation or line-by-line explanation.

115. Clients were instructed to sign electronically without having read or understood the content of the documents.

116. Defendants also copied, pasted, and digitized client signatures onto documents without the client's knowledge or specific authorization, including onto declarations containing fabricated allegations that the client had never reviewed.

117. *USCIS Filings*. Upon completion of the assembly-line process, Defendants filed the I-360 VAWA self-petitions with USCIS.

118. These filings were submitted without meaningful attorney review and without the client's informed understanding of their content.

119. Each filing was accompanied by the fabricated declaration, form applications with pre-checked boxes (including, in many cases, boxes alleging physical abuse that had never occurred), and supporting documents that the client had never reviewed.

120. *File Withholding*. When clients attempted to obtain their files (whether to seek successor counsel, to understand what had been filed on their behalf, or for any other reason) Defendants refused to release the files.

121. Defendants employed a series of pretextual excuses, including demands for "wet signatures" on release forms, claims that new G-28 forms were required, assertions that

unpaid balances precluded file release, and frivolous claims of "work product" privilege over documents that belonged to the client.

122. This file-withholding practice served to conceal the content of the filings from clients, prevent clients from discovering the fabrications in their declarations, delay or prevent clients from retaining successor counsel, and maintain Defendants' control over the client relationship and ongoing fee stream.

123. *Pattern and Scope*. Meneses' A.S.S. operation described above was not limited to Plaintiff's case. Defendants processed hundreds if not thousands of clients through this identical pipeline.

124. Dozens of former Meneses Law clients have already contacted successor counsel. Well over one hundred State Bar of Texas grievances have been filed against Frances Meneses and Meneses Law.

125. The 1,300-plus and counting marketing videos, the commission-based sales structure, the thirty-client-per-month quota, and the dedicated "creative writer" department all confirm that this was a high-volume, industrialized operation.

### B. Named Plaintiff's Experience

126. On or about September 23, 2024, Acosta first contacted Meneses Law after seeing advertisements on Facebook and other social media platforms.

127. The advertisements suggested that Meneses Law could help individuals with U.S. citizen children over the age of twenty-one obtain legal status, even if the individual had prior deportations or other immigration barriers.

128. Acosta spoke with a non-attorney staff member during an initial intake call that lasted

approximately thirty to forty-five minutes.

129. During this call, Acosta described the stress she experienced related to her son Giovanni, including her worry about his safety when he worked late nights, her concern about his emotional well-being, and the general stresses of their family dynamic.

130. The staff member systematically reframed Acosta's expressions of parental concern and family stress as a basis for an immigration petition.

131. Acosta's worry about her son working late nights was characterized as evidence that Giovanni was causing her emotional distress.

132. Her concern about his safety was recast as evidence of a pattern of conduct causing her mental anguish.

133. Normal parent-child tensions were recharacterized through a lens of "abuse" and "extreme cruelty."

134. At no point during the initial intake call was Acosta informed that she was being evaluated for or enrolled in a VAWA self-petition.

135. The term "VAWA" was never mentioned. Acosta believed she was being petitioned under a family based petition based on her relationship with her U.S. citizen son.

136. She did not understand that the petition would involve allegations that her son had abused her.

137. Defendants charged Acosta a total fee of $14,500. She paid an initial down payment of $3,550 and made ongoing monthly payments of $500.

138. Throughout her entire engagement with Meneses Law, Acosta never spoke with attorney Frances Meneses or any other attorney.

139. The attorney listed on her filings was Robert Victor Torrey, with whom Acosta also never spoke or communicated in any way.

140. Torrey executed both the Form G-28 Notice of Entry of Appearance as Attorney designating himself as Acosta's attorney of record and the preparer's certification on the Form I-360, in which he attested under penalty of perjury that he had prepared the petition and obtained Acosta's verification of its accuracy. Neither representation was true.

141. When it came time to sign the declaration and other filing documents, Acosta was called while she was at work. The call lasted less than ten minutes.

142. She was rushed into electronically signing documents that were presented in English. No Spanish translation was provided.

143. No line-by-line explanation of the declaration was given. She was not afforded the opportunity to read and understand what she was signing.

144. The declaration filed on Acosta's behalf contained significant exaggerations and outright falsehoods about her son Giovanni, including:

   a. False allegations that Giovanni was verbally abusive toward Acosta;

   b. False allegations that Giovanni used Acosta's immigration status against her and threatened to call the police on her;

   c. Mischaracterization of Acosta's concern for Giovanni's well-being — including his depression after a relationship breakup — as evidence of "emotional abuse" perpetrated by Giovanni against Acosta;

   d. The checking of the "physical abuse" box on the application form, despite the fact

that Giovanni has never hit Acosta, never assaulted her, and never made her fear physical harm.

145. The class claims do not depend on whether Acosta's individual VAWA petition was meritorious. Even assuming arguendo that some of her experiences might have supported a legitimate VAWA claim, the process by which Defendants handled her case including the concealment of VAWA, the non-attorney intake, the fabricated declaration, the unauthorized signature, the absence of attorney review, and the file withholding constituted clear and serious breaches of fiduciary duty that independently warrant fee forfeiture under *Burrow v. Arce*.

146. Acosta's experience is not unique. It mirrors the experiences of dozens of other former Meneses Law clients who have come forward to successor counsel. The uniformity of these experiences including the same marketing tactics, the same concealment of VAWA, the same non-attorney processing, the same fabricated declarations, the same rushed signing process, and even the same file withholding, confirms that Acosta was processed through the same standardized System as all other class members.

### C. Plaintiff's Damage

147. As a direct and proximate result of Defendants' conduct, Acosta has suffered the following damages:

   a. Fees paid to Defendants, including the $3,550 down payment and ongoing monthly payments of $500;

   b. Ongoing contractual payment obligations to Defendants for services that were fundamentally compromised;

c.  Costs of retaining successor counsel to review, assess, and remediate the filings made by Defendants;

d.  Costs and expenses associated with remediation of the VAWA petition, including potential withdrawal or amendment of filings containing falsehoods;

e.  Lost value of competent immigration legal representation during the period Defendants purported to represent her;

f.  Mental anguish, emotional distress, fear, and anxiety arising from the discovery that false statements were made to federal authorities in her name, exposing her to potential criminal liability and adverse immigration consequences.

148.  Acosta's damages are ongoing. She continues to face uncertainty regarding the status and consequences of the VAWA petition filed on her behalf, the potential criminal exposure arising from false statements made to USCIS, and the financial burden of successor counsel and remediation.

149.  *Acosta's damages are typical of the class*. All class members paid substantial fees, were processed through the same System, and face similar exposure to the consequences of filings they did not meaningfully authorize or understand.

## VI.   CLASS ACTION ALLEGATIONS

### A.   Class Definition

150.  Plaintiff brings this action on behalf of herself and the following class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(3), and, in the alternative, 23(c)(4):

a.  The Class: All persons who: (i) retained Meneses Law, PLLC during the applicable limitations period; (ii) paid fees for services involving Form I-360; and

(iii) whose matter was processed through Meneses Law's standardized intake, declaration drafting, signature, and filing system.

151. Class membership is determinable from Defendants' own records, including retainer agreements, G-28 forms, I-360 filing receipts, payment logs, and case management files.

152. Individualized testimony is not required to identify class members.

### B.    Subclasses

153. *Certification Subclasses*. Plaintiff seeks certification of the following subclasses for the purpose of asserting direct breach of fiduciary duty claims against the specific attorney who executed the preparer's certification on each subclass member's Form I-360. By executing that certification under penalty of perjury, each certifying attorney assumed a direct attorney-client fiduciary obligation to every client on whose behalf the certification was made.

   a. *Torrey Certification Subclass*. All members of the Class whose Form I-360 VAWA self-petition was submitted to USCIS bearing the signature of Robert Victor Torrey as the designated preparer. Representative Plaintiff: Reyna Ángeles Acosta. Torrey executed the preparer's certification on Acosta's Form I-360; her claims against Torrey are therefore typical of and directly representative of every member of this subclass.

   b. *Robertson Certification Subclass*. All members of the Class whose Form I-360 VAWA self-petition was submitted to USCIS bearing the signature of Rachel Victoria Robertson as the designated preparer. Representative Plaintiff: A co-named plaintiff will be identified and added by amendment prior to or

concurrently with filing of the motion for class certification. Plaintiff's counsel has identified former Meneses Law clients whose Form I-360 petitions bear Robertson's signature as preparer. Ms. Robertson is not presently a named defendant; Plaintiff reserves the right to add her as a defendant by amendment upon identification of the co-named plaintiff.

c. *Other Preparer Subclass*. All members of the Class whose Form I-360 was submitted to USCIS bearing the signature of any attorney or authorized representative other than Torrey or Robertson. The identities of all other certifying preparers will be established through discovery of Defendants' USCIS filing records and case management system.

154. Harm-Based Subclasses.

a. *Unauthorized Signature Subclass*: All members of the Class whose signatures were copied, pasted, digitized, or otherwise affixed to declarations or other filing documents without meaningful review of the document's contents by the client.

b. *File-Withholding Subclass*: All members of the Class whose requests for their client files were refused, delayed, or conditioned on pretextual requirements by Defendants.

155. *Note on Subclass Interaction*. Membership in the Certification Subclasses and the Harm-Based Subclasses is not mutually exclusive. The Certification Subclasses govern direct fiduciary breach claims against each individual certifying attorney-defendant. The Harm-Based Subclasses govern claims against all Defendants arising from the specific categories of misconduct. Plaintiff does not seek duplicative recovery and the Court is

requested to fashion a non-duplicative remedy at judgment.

### C. Rule 23(a) Requirements

156. Numerosity. The class is so numerous that joinder of all members is impracticable. At least five dozen former Meneses Law clients have already contacted successor counsel.

157. Defendants processed hundreds if not thousands of clients through the Meneses A.S.S. operation during the applicable limitations period.

158. Defendants' production of more than 1,300+ marketing videos, their employment of commission-based sales representatives subject to quotas of closing thirty clients per month, and their maintenance of a dedicated "creative writer" department all confirm that the class numbers in the hundreds or thousands.

159. *Commonality*. There are questions of law and fact common to the class that are capable of classwide resolution. These common questions include:

    a. Whether Defendants employed scripted protocols instructing staff to avoid using the term "VAWA" with clients;

    b. Whether Defendants used non-attorney "licenciadas" as the primary point of client contact;

    c. Whether the licenciadas were compensated on a commission basis and subject to client-volume quotas;

    d. Whether Defendants used standardized retainer agreements that failed to disclose the nature of VAWA;

    e. Whether all substantive client intake was conducted by non-attorney staff;

    f. Whether Defendants employed "creative writers" to draft client declarations

without client contact;

g. Whether the creative writers fabricated, exaggerated, or recharacterized facts in those declarations;

h. Whether client signatures were obtained through rushed electronic signing without meaningful review;

i. Whether Defendants copied, pasted, or digitized client signatures without specific authorization;

j. Whether any attorney at Meneses Law conducted substantive client interviews;

k. Whether any attorney reviewed the accuracy of declarations prior to filing;

l. Whether the individuals who signed the preparer's certification actually spoke with the clients to obtain their confirmation that the "information in the form and in the supporting documents is complete, true, and correct."

m. Whether the the individuals who signed the interpreter's certification actually "read to this petitioner or the authorized signatory in the identified language every question and instruction on this petition and his or her answer to every question."

n. Whether the the individuals who signed the interpreter's certification actually obtained the verification from the clients of "the accuracy of every answer."

o. Whether Defendants' uniform policies and practices constituted a clear and serious breach of fiduciary duty;

p. Whether Defendants withheld client files using pretextual excuses;

q. Whether Defendants' conduct constituted a pattern of racketeering activity;

r. Whether class members are entitled to fee forfeiture and disgorgement.

160. *Typicality*. Plaintiff's claims are typical of the claims of the class. Acosta's claims arise from the same uniform conduct, the same standardized system, and the same pipeline that every class member was processed through.

161. She was subjected to the same marketing, the same concealment, the same non-attorney intake, the same creative writer declaration process, the same rushed signing procedure, and the same file-withholding tactics as other class members.

162. Acosta's claims are typical regardless of the VAWA petition category applicable to any class member. The concealment mechanism included staff being prohibited from using the word 'VAWA,' petitions described as a 'family 360,' no disclosure of the abuse-allegation requirement and was uniform across both parent-based and spouse-based petition categories.

163. The typicality question is whether every class member was processed through the same concealment-and-fabrication system, not whether the specific family relationship alleged as the basis for abuse was identical. It was.

164. Her claims are based on the same legal theories and seek the same relief.

165. *Adequacy*. Plaintiff will fairly and adequately protect the interests of the class. Acosta has no interests antagonistic to or in conflict with the class.

166. She has retained experienced counsel who are competent to prosecute this class action.

167. Plaintiff's interests are aligned with those of the class: all class members seek fee forfeiture, disgorgement, and damages arising from the same systematic conduct.

### D.      Rule 23(b)(3) Predominance and Superiority

168. *Predominance*. Common questions of law and fact predominate over any questions

affecting only individual class members. The central questions in this case (whether Defendants operated a standardized System, whether that System involved concealment, fabrication, unauthorized signatures, and absence of attorney oversight, and whether that System constituted a clear and serious breach of fiduciary duty) are entirely common to the class.

169. These questions are provable from Defendants' own records, including scripts, training materials, policies, employment records, compensation structures, retainer templates, and case management systems.

170. Fee forfeiture under *Burrow v. Arce* does not require proof of actual damages to the client.

171. The Court need not conduct individualized inquiries into whether any particular client's VAWA petition was meritorious, whether the fabrications in any particular declaration were material, or whether any particular client suffered immigration consequences.

172. The only relevant inquiry is whether Defendants committed clear and serious breaches of fiduciary duty through their uniform system which is a question that is entirely common to the class.

173. Individual questions, such as whether a particular class member had a valid VAWA claim, whether a particular declaration was accurate, or whether a particular class member suffered immigration consequences, are irrelevant to the fee forfeiture theory and do not predominate.

174. *Superiority*. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Individual class members have claims of approximately

$13,550 to $25,000 or more in fees alone. While these amounts are significant to the individual class members, who are predominantly low-income, undocumented immigrants, they are insufficient to justify the cost and complexity of individual federal litigation. Many class members have limited English proficiency, limited financial resources, and limited access to legal representation. A class action provides the only realistic mechanism for these individuals to seek redress.

175. Moreover, the concentration of class members' claims in a single proceeding promotes judicial efficiency, avoids inconsistent adjudications, and enables comprehensive discovery of Defendants' standardized practices.

### E.    Rule 23(c)(4) Issue Certification (Alternative)

176. In the alternative, Plaintiff seeks certification of the following issues for classwide resolution under Rule 23(c)(4):

a.  Whether Defendants' uniform policies and practices constituted clear and serious breaches of fiduciary duty;

b.  Whether Defendants' file-withholding practices were wrongful;

c.  Whether Defendants' signature practices lacked informed client consent;

d.  Whether fees paid by class members should be disgorged under the fee forfeiture doctrine.

## VII.   CAUSES OF ACTION

### COUNT I

### BREACH OF FIDUCIARY DUTY AND FEE FORFEITURE

**(Against Defendants Meneses Law, PLLC, Frances Christine Meneses, and Robert Victor Torrey for Direct Fiduciary Breach; Against Defendants Julio Carlos Meneses and Meneses Enterprises, LLC for Knowing Participation in Fiduciary Breach)**

177.   Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

178.   The relationship between an attorney and client is a fiduciary relationship as a matter of Texas law. Meneses Law, PLLC, as the entity that entered into representation agreements with Plaintiff and class members, owed fiduciary duties to each client arising directly from those agreements and from Texas Disciplinary Rules of Professional Conduct.

179.   Frances Christine Meneses, as the supervising attorney and principal member of Meneses Law, personally owed fiduciary duties to each client as the attorney of record responsible for supervising the legal services rendered.

180.   These duties encompass loyalty, candor, full disclosure, fair dealing, and the duty not to conceal material information from the client.

181.   Defendants Julio Carlos Meneses and Meneses Enterprises, LLC are liable for knowing participation in the fiduciary breaches committed by Meneses Law and Frances Meneses. Texas law recognizes a cause of action for knowing participation in a breach of fiduciary duty against a third party who, with knowledge that a fiduciary relationship exists, knowingly participates in the breach of that fiduciary duty.

182.   Julio Meneses, as Vice President of Meneses Law, participated in the management,

direction, and financial oversight of the enterprise that committed the fiduciary breaches described herein, with full knowledge of the policies and practices that constituted those breaches.

183. Meneses Enterprises, LLC, as an entity controlled by Frances Meneses and Julio Meneses that received and retained proceeds of the scheme, participated in and benefited from those breaches with constructive or actual knowledge of their fiduciary character.

184. Defendant Robert Victor Torrey independently owed fiduciary duties to Plaintiff Acosta and to each member of the Torrey Certification Subclass.

185. Those duties arose from Torrey's voluntary undertaking of the attorney-client relationship through his execution of Form G-28 as attorney of record and the preparer's certification on each class member's Form I-360.

186. The attorney-client relationship in Texas arises from the attorney's conduct and voluntary assumption of the representation, not solely from a formal retainer agreement.

187. By placing his name and signature on a sworn federal filing designating himself as Acosta's attorney of record, Torrey assumed the full fiduciary obligations of the attorney-client relationship.

188. Torrey breached his fiduciary duties through the following specific conduct: (a) he executed the preparer's certification on Acosta's Form I-360, attesting under penalty of perjury that he had personally prepared the petition and obtained Acosta's verification of its accuracy, when in fact he had done neither; (b) he submitted or caused to be submitted to USCIS a petition he knew or should have known contained fabricated allegations about Acosta's son Giovanni; (c) he made no effort to verify the accuracy of the

declaration, communicate with Acosta, or exercise the independent professional judgment that the attorney-client relationship requires; and (d) he participated in and enabled the enterprise's practice of lending his bar credentials to filings he knew were manufactured without attorney involvement.

189. This is not a standard-of-care claim. Plaintiff does not allege that Torrey failed to exercise reasonable professional judgment in the preparation of Acosta's petition. Plaintiff alleges that Torrey was fundamentally disloyal, that he made sworn false representations to a federal agency on behalf of a client he never met, in furtherance of a system designed to manufacture false federal filings for profit.

190. That conduct is disloyalty per se. It constitutes a clear and serious breach of fiduciary duty, entitling Plaintiff and Torrey Certification Subclass members to fee forfeiture.

191. The fiduciary duties owed by Defendants to Plaintiff and class members include, but are not limited to, the duties of loyalty, candor, good faith, full disclosure, fair dealing, and the duty not to conceal material information from the client.

192. Defendants breached their fiduciary duties through the following conduct, each of which constitutes a clear and serious breach:

   a. Concealing from clients the true nature of the VAWA petition and the fact that it required allegations of abuse by the client's own family member;

   b. Implementing quota-driven, commission-based sales practices that prioritized revenue over client welfare;

   c. Processing all client matters through non-attorney staff without meaningful attorney supervision or involvement;

d. Manufacturing declarations containing fabricated, exaggerated, recharacterized and/or false allegations through a "creative writer" department that had no contact with clients;

e. Obtaining client signatures on declarations and other critical documents through rushed, non-translated, non-explained electronic signing processes;

f. Copying, pasting, and digitizing client signatures without specific client authorization;

g. Filing petitions with USCIS without meaningful attorney review and without the client's informed understanding of the petition's contents;

h. Withholding client files using pretextual excuses to conceal the content of filings and prevent clients from seeking successor counsel;

i. Retaining substantial fees for services that were fundamentally compromised by the foregoing breaches.

193. A client need not prove actual damages to obtain fee forfeiture when the attorney has committed a clear and serious breach of fiduciary duty.

194. The purpose of fee forfeiture is to protect the attorney-client relationship by discouraging attorney disloyalty, not to compensate the client for quantifiable harm.

195. The focus of the inquiry is on the gravity of the attorney's breach, not the existence or extent of the client's loss.

196. In determining the appropriate amount of forfeiture, courts consider: (1) the gravity and timing of the violation; (2) the degree to which the violation was willful; (3) the effect of the violation on the value of the services provided to the client; (4) the adequacy of other

remedies; and (5) the public interest in maintaining the integrity of attorney-client relationships.

197. All five factors weigh in favor of complete or near-complete forfeiture here, as set forth below.

198. Defendants' breaches were clear and serious, and each *Burrow* proportionality factor supports complete forfeiture.

199. *First, as to gravity*: Defendants' breaches pervaded every stage of the representation from the initial concealment of VAWA at intake, through the fabrication of declarations by employees who never spoke with clients, through the unauthorized use of electronic signatures, through the filing of materially false federal immigration documents under penalty of perjury, and through the systematic withholding of client files.

200. *Second, as to willfulness*: These were not lapses of professional judgment. They were deliberate, top-down policies implemented through firm-wide quotas, commission structures, and employee termination. The concealment of VAWA was an express, enforced prohibition. The creative writer department was a purpose-built system for generating false declarations at scale. No element of inadvertence, negligence, or good faith is present.

201. *Third, as to value of services*: The services rendered were fundamentally compromised from the moment of retention. Any VAWA petition submitted through this process exposed the client to criminal liability under 18 U.S.C. § 1546. A service that creates criminal exposure for the client it purports to serve has no positive value.

202. *Fourth, as to other remedies*: For class members whose petitions were approved and who

received work authorization, compensatory damages are difficult to quantify, making fee forfeiture the only adequate remedy.

203. *Fifth, as to public interest*: The public interest in protecting vulnerable, undocumented, Spanish-speaking immigrants from exploitation by licensed attorneys who exploit their trust, their desperation, and their limited capacity to discover the fraud is compelling and warrants the full deterrent effect of complete forfeiture.

204. This is a loyalty claim, not a negligence or malpractice claim. Plaintiff does not allege that Defendants failed to meet the standard of care applicable to immigration attorneys.

205. Plaintiff alleges that Defendants were fundamentally disloyal to their clients by concealing material information, manufacturing false documents, and operating an assembly-line system devoid of individualized legal judgment.

206. These are breaches of the duty of loyalty, which is distinct from and more fundamental than the duty of care.

207. Plaintiff and class members seek forfeiture and disgorgement of fees paid to Defendants in an amount to be determined by the Court in its equitable discretion.

208. Given the gravity of the breaches, their deliberate and systematic character, and the absence of any genuine legal value in the services rendered, Plaintiff submits that the equitable factors compel complete forfeiture of all fees collected from every class member.

209. Plaintiff and class members further seek exemplary damages under Texas Civil Practice and Remedies Code Chapter 41 for Defendants' fraudulent, malicious, and grossly negligent conduct.

## COUNT II
## UNJUST ENRICHMENT / MONEY HAD AND RECEIVED
### (Against All Defendants — Pleaded in the Alternative)

210. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

211. Defendants received and retained fees paid by Plaintiff and class members for immigration legal services. These fees were obtained through a deceptive, fiduciary-breaching process that deprived clients of the benefit of their bargain.

212. It would be inequitable for Defendants to retain these fees. The focus of this claim is on the money paid and retained, not on immigration outcomes.

213. Regardless of whether any individual client's VAWA petition was meritorious or was approved, Defendants obtained fees through a fundamentally compromised process, and equity requires that those fees be returned.

214. As to Defendant Torrey, this claim is based on the compensation he received from Meneses Law that was funded by and derived from fees paid by Plaintiff and class members through the scheme described herein, which it would be inequitable for him to retain.

215. Plaintiff and class members seek restitution of all fees paid to Defendants, together with pre-judgment and post-judgment interest.

## COUNT III
## CIVIL RICO: 18 U.S.C. § 1962(c)
### (Against Defendants Frances Christine Meneses and Robert Victor Torrey)

216. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

217. *RICO Person*. Defendant Frances Christine Meneses is a "person" within the meaning of 18 U.S.C. § 1961(3), capable of holding a legal or beneficial interest in property.

218. *Enterprise*. The RICO enterprise is Meneses Law, PLLC, a legal entity within the meaning of 18 U.S.C. § 1961(4), or, in the alternative, an association-in-fact enterprise consisting of Meneses Law, PLLC, Frances Christine Meneses, Julio Carlos Meneses, Robert Victor Torrey, other attorneys who served as nominal signatories, sales representatives (licenciadas), creative writers, interpreters and other staff members, and Meneses Enterprises, LLC.

219. Defendant Robert Victor Torrey is a "person" within the meaning of 18 U.S.C. § 1961(3), distinct from the association-in-fact enterprise of which he was a member. As a person who conducted or participated in the conduct of the enterprise's affairs through the pattern of racketeering activity described herein, Torrey is separately liable under 18 U.S.C. § 1962(c).

220. The enterprise had a common purpose: to generate revenue through the systematic filing of VAWA self-petitions on behalf of vulnerable immigrants.

221. The enterprise had an organized structure with distinct roles:

   a. *Marketing*: production and dissemination of Spanish-language social media advertisements;

   b. *Sales (Licenciadas)*: initial client contact, intake screening, and retention;

   c. *Intake*: structured interviews to extract facts suitable for recharacterization as abuse;

   d. *Creative Writers*: fabrication and drafting of declarations based on intake notes;

e. *Signing*: rushed electronic signature process without meaningful review;

f. *Filing*: submission of completed petitions to USCIS.

222. *Pattern of Racketeering Activity*. Frances Meneses conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity consisting of multiple acts of:

a. Wire Fraud (18 U.S.C. § 1343): Defendants used interstate wire communications including internet marketing, telephone intake calls, electronic signature platforms, and receiving electronic payments to execute a scheme to defraud clients by obtaining fees through material misrepresentations and concealment regarding the nature and quality of the legal services provided;

b. *Mail Fraud* (18 U.S.C. § 1341): Defendants used the United States mail to send retainer agreements, invoices, USCIS filings and other communications in furtherance of the scheme;

c. *Immigration Document Fraud* (18 U.S.C. § 1546): Defendants prepared, filed, and caused to be filed immigration documents, including Form I-360 VAWA self-petitions and accompanying declarations that contained material false statements, fabricated allegations, and unauthorized signatures.

223. The following representative wire fraud predicate acts occurred in Acosta's individual case, each transmitted by interstate wire in furtherance of the scheme to defraud by the Defendants:

a. ***Predicate Act 1*** - Marketing Wire (on or about September 2024): Meneses Law disseminated, via Facebook, TikTok and other social media platforms,

Spanish-language video advertisements targeting Acosta and similarly situated undocumented immigrants with U.S. citizen children over age twenty-one.

    i.    The advertisements represented, falsely and by omission, that Meneses Law could obtain lawful immigration status and work permits through a family-based immigration process without disclosing that the only pathway being offered was a VAWA self-petition requiring allegations of abuse by the client's own family member.

    ii.    *Sender*: Meneses Law, PLLC / Frances Christine Meneses.

    iii.    *Recipient*: Acosta and class.

    iv.    *Wire*: Interstate social media transmission.

    v.    *Misrepresentation*: Nature and basis of available immigration relief.

    vi.    Fees paid to date: approximately $11,175 ($3,550 down payment plus ongoing monthly payments of $500); total contracted fee: $14,500.

    vii.    Additionally, on November 12, 2025, Frances Meneses transmitted via interstate electronic wire a TikTok video in which she falsely represented to Spanish-speaking audiences that "Immigration has published that 91% to 92% of VAWA cases have been approved in recent years", a claim that does not correspond to any USCIS publication, and mischaracterized competing humanitarian visa categories as having only a "50% chance of winning," creating a false impression that VAWA was the uniquely high-probability immigration remedy.

    viii.    This false transmission was made in furtherance of the wire fraud scheme

by inducing additional vulnerable immigrants to engage Defendants for fabricated I-360 petitions, constituting an additional predicate act of wire fraud in violation of 18 U.S.C. §1343.

ix. The video in question represents a single instance of the fraudulent and intentionally manipulative media generated by the Defendants. Numerous similar examples exist, illustrating a broader pattern of exploiting the hopes and vulnerabilities of the immigrant community to lure them into the firm for purely predatory financial gain.

b. ***Predicate Act 2*** - Intake Call Wire (on or about September 23, 2024): A non-attorney "licenciada" employed by Meneses Law conducted a thirty-to-forty-five minute intake telephone call with Acosta on or about September 23, 2024.

i. During this call, the licenciada concealed that Acosta was being evaluated for and enrolled in a VAWA self-petition, instead representing the process as a family-based "360 petition."

ii. The licenciada systematically reframed Acosta's descriptions of her son Giovanni's conduct as evidence of "abuse" and "extreme cruelty" without Acosta's understanding or consent.

iii. *Sender*: Meneses Law licenciada.

iv. *Recipient*: Acosta.

v. *Wire*: Interstate telephone.

vi. *Misrepresentation*: Nature of petition; characterization of client's family

relationship as basis for abuse allegations.

vii.   Fees paid to date: approximately $11,175 ($3,550 down payment plus ongoing monthly payments of $500); total contracted fee: $14,500.

c. ***Predicate Act 3*** - Retainer Agreement Wire (on or about September 23, 2024): Meneses Law transmitted a standardized retainer agreement to Acosta by electronic means. The retainer identified the contemplated services only by USCIS form number ("I-360") without disclosing that the petition was a VAWA self-petition, that it would require allegations of domestic violence or extreme cruelty by a qualifying family member, or that filing a false VAWA petition exposes the petitioner to federal criminal liability under 18 U.S.C. § 1546.

   i.   The retainer was presented in English to a Spanish-speaking client without translation.

   ii.   *Sender*: Meneses Law, PLLC.

   iii.   *Recipient*: Acosta.

   iv.   *Wire*: Electronic transmission of retainer agreement.

   v.   *Misrepresentation*: Material omission of VAWA nature, abuse-allegation requirement, and criminal exposure risk.

   vi.   Fees paid to date: approximately $11,175 ($3,550 down payment plus ongoing monthly payments of $500); total contracted fee: $14,500.

d. ***Predicate Act 4*** - Ongoing Fee Collection Wires (October 2024 through present): On a monthly basis following retention, Meneses Law collected $500 monthly fee installment payments from Acosta via electronic wire transfer or electronic

payment platform.

    i.    Each monthly collection constituted a separate predicate act of wire fraud, as each payment was obtained through the ongoing misrepresentation that competent, lawful, and ethically compliant immigration representation was being provided.

| Date | Payment Method | Amount |
|---|---|---|
| Jan 21, 2026 | Visa #B24-C74F9 entered in-office | $500.00 |
| Jan 12, 2026 | Visa #FCA-D45C6 entered in-office | $625.00 |
| Nov 10, 2025 | Visa #9F6-985E1 processed automatically for payment plan installment | $500.00 |
| Oct 10, 2025 | Visa #BC0-8C2A7 processed automatically for payment plan installment | $500.00 |
| Sep 10, 2025 | Visa #BBC-31758 processed automatically for payment plan installment | $500.00 |
| Aug 10, 2025 | Visa #589-2942F processed automatically for payment plan installment | $500.00 |
| Jul 10, 2025 | Visa #FE7-B8656 processed automatically for payment plan installment | $500.00 |
| Jun 10, 2025 | Visa #60B-7BA80 processed automatically for payment plan installment | $500.00 |
| May 10, 2025 | Visa #270-D2532 processed automatically for payment plan installment | $500.00 |
| Apr 10, 2025 | Visa #2F2-DEECC processed automatically for payment plan installment | $500.00 |
| Mar 10, 2025 | Visa #168-2777E processed automatically for payment plan installment | $500.00 |
| Feb 10, 2025 | Visa #44B-863B3 processed automatically for payment plan installment | $500.00 |
| Jan 10, 2025 | Visa #28E-FAB00 processed automatically for payment plan installment | $500.00 |
| Dec 10, 2024 | Visa #E9D-08345 processed automatically for payment plan installment | $500.00 |
| Nov 10, 2024 | Visa #5FA-AAEA9 processed automatically for payment plan installment | $500.00 |
| Oct 1, 2024 | Visa #A97-EBC4E entered in-office | $3,550.00 |

    ii.    *Sender*: Acosta (induced).

iii. *Recipient*: Meneses Law, PLLC / Meneses Enterprises, LLC.

iv. *Wire*: Electronic payment wire.

v. Fees paid to date: approximately $11,175 ($3,550 down payment plus ongoing monthly payments of $500); total contracted fee: $14,500.

e. ***Predicate Act 5*** - Declaration Fabrication Wire (date to be determined through discovery): A "creative writer" employee of Meneses Law, having no direct contact with Acosta, fabricated a personal declaration attributed to Acosta and transmitted that fabricated declaration to Acosta via an electronic signature platform for execution.

 i. This declaration contained material falsehoods, including allegations that Giovanni was verbally abusive, that he threatened to report Acosta to law enforcement, and that the "physical abuse" box was marked despite the complete absence of any physical abuse.

 ii. This transmission constituted wire fraud under 18 U.S.C. § 1343 as a use of interstate wire communications in furtherance of a scheme to defraud specifically, to produce a false USCIS filing that would generate revenue for Defendants while exposing Acosta to criminal liability and unwanted removal from the United States.

 iii. *Sender*: Meneses Law creative writer (via Meneses Law's case management and electronic signature system).

 iv. *Recipient*: Acosta (transmitted via electronic signature platform to Acosta in Austin, Travis County, Texas)

v. *Wire*: Interstate electronic transmission via electronic document execution platform (upon information and belief, DocuSign, Adobe Sign, or equivalent platform whose servers are located outside the State of Texas), through which the fabricated declaration traveled from Meneses Law's offices in Houston, Harris County, Texas, to Plaintiff Acosta in Austin, Travis County, Texas, constituting an interstate wire communication within the meaning of 18 U.S.C. § 1343

vi. Fees paid to date: approximately $11,175 ($3,550 down payment plus ongoing monthly payments of $500); total contracted fee: $14,500.

f. ***Predicate Act 6*** — Electronic Signature Wire (date to be determined through discovery): A Meneses Law employee called Acosta while she was at work and, within a less than ten-minute telephone call, induced her to electronically sign the fabricated declaration and other filing documents presented in English without translation, explanation, or opportunity for meaningful review.

i. The electronic signature platform transmitted the signed documents via interstate wire.

ii. *Sender*: Meneses Law staff.

iii. *Recipient*: Acosta (induced); electronic signature platform (transmission).

iv. *Wire*: Telephone call and electronic signature platform transmission.

v. *False representation*: That the documents accurately reflected Acosta's experience and that signing was a routine administrative step.

vi. Fees paid to date: approximately $11,175 ($3,550 down payment plus

ongoing monthly payments of $500); total contracted fee: $14,500.

g. ***Predicate Act 7*** — USCIS Mail Fraud (date to be determined through discovery): Defendants submitted Acosta's Form I-360 VAWA self-petition, the fabricated declaration, and supporting documents to USCIS via US mail. The filing contained material false statements, including the fabricated abuse allegations and the unauthorized checking of the "physical abuse" box in violation of 18 U.S.C. § 1546(a).

    i. The submission was made under the preparer's certification signature of Defendant Robert Victor Torrey. Torrey's certification attested, under penalty of perjury, that he had personally prepared the petition and obtained Plaintiff Acosta's verification that every answer in the form and supporting documents was complete, true, and correct.

    ii. Torrey did not prepare the petition, it was manufactured by a "creative writer" employee of Meneses Law who never spoke with Acosta.

    iii. Torrey never spoke with, communicated with, or met Acosta in any way prior to executing that certification. His certification was knowingly false.

    iv. *Sender*: Meneses Law, PLLC.

    v. *Recipient*: USCIS (federal agency).

    vi. *Mail*: US postal service.

    vii. *Falsity*: Material false statements regarding abuse and physical violence.

    viii. Fees paid to date: approximately $11,175 ($3,550 down payment plus ongoing monthly payments of $500); total contracted fee: $14,500.

224. The precise dates of Predicate Acts 5, 6, and 7 are within Defendants' exclusive possession and will be established through discovery of Defendants' case management system, e-filing records, and electronic signature platform logs.

225. The following representative predicate acts of immigration document fraud under 18 U.S.C. § 1546 and wire fraud under 18 U.S.C. § 1343 are attributable specifically to Defendant Torrey:

   a. Predicate Act T-1 False Preparer Certification (Acosta file, date of USCIS filing, to be confirmed through discovery):

   i. Defendant Torrey executed the preparer's certification on Plaintiff Acosta's Form I-360 VAWA self-petition. That certification is a sworn statement under penalty of perjury that Torrey had personally prepared the form, examined the information in the form and the supporting documents, and obtained Acosta's verification that the information was complete, true, and correct.

   ii. Preparer: Robert Victor Torrey.

   iii. Client/Victim: Reyna Ángeles Acosta.

   iv. Instrument: Form I-360 preparer's certification, executed under penalty of perjury.

   v. Falsity: Torrey did not prepare the petition; it was manufactured by a "creative writer" employee. Torrey never communicated with Acosta. The declaration contained fabricated allegations he never reviewed.

   vi. Statute: 18 U.S.C. § 1546(a) (false statement in immigration document

executed under penalty of perjury). The executed certification was transmitted to USCIS, a federal agency, via interstate mail, constituting an independent act of wire/mail fraud under 18 U.S.C. §§ 1341, 1343.

b. Predicate Act T-2 Pattern of False Preparer Certifications (Class Period, systematic):

i. Upon information and belief, Torrey executed materially identical false preparer certifications on the Form I-360 petitions of a substantial number of other class members during the class period, each of which constitutes a separate predicate act of immigration document fraud under 18 U.S.C. § 1546(a) and mail fraud under 18 U.S.C. § 1341. The precise number of such certifications, and their dates, will be established through discovery of USCIS filing records and Meneses Law's case management system.

226. The specific individuals involved in each predicate act beyond Acosta's case, including the licenciadas, creative writers, and nominal signing attorneys for class members other than Acosta (among whom, upon information and belief, Rachel Robertson served as certifying attorney on a substantial number of files) are within Defendants' records and will be established through discovery.

227. Each predicate act described above was repeated, in materially identical form, for every client processed through Defendants' system during the class period.

228. The predicate acts extend well beyond Acosta's individual case as Defendants processed hundreds and thousands of similar cases through the same system, each involving the same pattern of wire fraud, mail fraud, and immigration document fraud.

229. *Relationship and Continuity*. The predicate acts are related because they share a common purpose (generating revenue through systematic VAWA filings), common participants (Frances Meneses, Julio Meneses, the licenciadas, the creative writers), common methods (concealment, fabrication, rushed signatures, file withholding), and common victims (vulnerable, predominantly undocumented, Spanish-speaking immigrants).

230. The pattern has continuity because it extended over a period of at least two years, involved hundreds of victims, and, upon information and belief, is ongoing.

231. *Property Injury*. Plaintiff and class members suffered injury to their business or property by reason of the RICO violations, including fees paid, ongoing payment obligations, costs of successor counsel, and costs of remediation. The RICO injury is limited to these business and property losses and does not include claims for immigration status or emotional distress.

232. Plaintiff and class members seek treble damages, costs, and reasonable attorney's fees pursuant to 18 U.S.C. § 1964(c).

**COUNT IV**
**RICO CONSPIRACY: 18 U.S.C. § 1962(d)**
**(Against All Individual Defendants)**

233. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

234. Each individual Defendant conspired to violate 18 U.S.C. § 1962(c) as described above.

235. Defendant Frances Christine Meneses was the architect of the policies, quotas, scripts, and systems that constituted the enterprise's racketeering activity.

236. She designed and directed the concealment of VAWA, the commission-based sales

structure, the creative writer department, the signature process, and the file-withholding practices.

237. Defendant Julio Carlos Meneses served as Vice President of Meneses Law and co-manager of Meneses Enterprises, LLC, and committed the following overt acts in furtherance of the RICO conspiracy: (a) upon information and belief, executed or authorized the formation documents of Meneses Enterprises, LLC on or about November 14, 2023, establishing the entity that served as the financial vehicle for the receipt and concealment of proceeds from the scheme; (b) participated in the management of personnel including the licenciadas whose commission-based quota structure was the engine of the fraudulent enrollment pipeline through his role in day-to-day operations and financial oversight; (c) authorized or ratified the marketing campaign that generated more than 1,300 Spanish-language social media videos designed to funnel vulnerable immigrants into the assembly-line VAWA pipeline; (d) directed or approved the co-mingling or transfer of enterprise revenues through Meneses Enterprises, LLC in furtherance of the scheme; and (e) participated in or ratified the file-withholding practices used to prevent clients from discovering the fraudulent nature of their filings.

238. The precise scope of Julio Meneses' overt acts will be established through discovery of Meneses Law and Meneses Enterprises' financial records, management communications, and HR and payroll systems.

239. Defendant Robert Victor Torrey conspired to violate 18 U.S.C. § 1962(c) as described above. Torrey agreed to serve as a nominal signing attorney for Meneses Law, executing G-28 forms and preparer certifications on petitions he knew he had not prepared and for

clients he knew he had not consulted, in exchange for compensation and in furtherance of the enterprise's scheme.

240. By knowingly lending his bar credentials to the enterprise's manufacturing pipeline, Torrey agreed to and facilitated the enterprise's core racketeering activity, the mass production and submission of false immigration documents under the certified signature of a licensed attorney.

241. Torrey's actions and omissions are sufficient to establish that he agreed to facilitate the enterprise that committed them.

242. Each individual Defendant knew the essential nature and scope of the enterprise and its racketeering activity, agreed to participate in the enterprise's affairs, and took overt acts in furtherance of the conspiracy.

243. Plaintiff and class members seek treble damages, costs, and reasonable attorney's fees pursuant to 18 U.S.C. § 1964(c).

**COUNT V**
**VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT**
**Tex. Bus. & Com. Code §§ 17.41–17.63**
**(Against Defendants Meneses Law, PLLC, Meneses Enterprises, LLC, Frances Christine Meneses, and Julio Carlos Meneses.)**

244. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

245. This Count is limited to Defendants' marketing, advertising, sales, and client enrollment conduct such as the representations, omissions, and practices by which Defendants induced Plaintiff and class members to retain Meneses Law, sign retainer agreements, and pay fees.

246.    This Count does not challenge Defendants' professional legal judgment, assert that Defendants failed to meet the standard of care applicable to immigration attorneys, or otherwise sound in professional malpractice. Rather, this Count challenges the deceptive commercial conduct by which Defendants operated as a high-volume consumer sales enterprise, making express misrepresentations of material fact and exploiting consumers' vulnerability during the marketing, sales, and enrollment phases of Defendants' operation.

247.    This conduct is not exempted by the professional services exemption of Tex. Bus. & Com. Code § 17.49(c), which does not apply to express misrepresentations of material fact, Latham v. Castillo, 972 S.W.2d 66, 69 (Tex. 1998), and does not apply to unconscionable conduct under § 17.50(a)(3).

248.    Plaintiff Acosta and each class member is a "consumer" within the meaning of Tex. Bus. & Com. Code § 17.45(4) because each is an individual who sought or acquired, by purchase, immigration legal services from Defendants for valuable consideration. Each class member paid fees ranging from approximately $13,550 to $25,000 or more in exchange for the immigration services Defendants represented they would provide.

249.    Each Defendant is a "person" within the meaning of Tex. Bus. & Com. Code § 17.45(3) and engaged in "trade" or "commerce" within the meaning of § 17.45(6) in connection with the marketing, sale, and provision of immigration legal services to consumers in the State of Texas. Defendants' conduct in marketing, enrolling, and collecting fees from clients constituted the conduct of business in trade or commerce regardless of its characterization as legal services.

250.    Defendants committed false, misleading, and deceptive acts and practices in the conduct

of trade or commerce in violation of Tex. Bus. & Com. Code § 17.46(b), including:

a.  *§ 17.46(b)(5) Misrepresentation of service characteristics.* Representing through Spanish-language social media advertisements, sales calls, and marketing materials that Defendants provided competent, attorney-supervised, individualized immigration legal representation, when in fact the services consisted of a standardized assembly-line system in which no attorney conducted a substantive client interview, reviewed any declaration for accuracy, or exercised independent professional judgment on any matter;

b.  *§ 17.46(b)(7) - Misrepresentation of service quality and standard.* Representing or implying in marketing and enrollment communications that Defendants' immigration services met the professional and ethical standards applicable to licensed immigration attorneys and Texas law firms, when in fact all substantive client functions were performed by non-attorney sales representatives and "creative writers" following scripted protocols, without attorney supervision or review;

c.  *§ 17.46(b)(12) — Misrepresentation of agreement terms.* Representing in standardized retainer agreements that those agreements conferred competent immigration legal services involving attorney-supervised preparation of Form I-360, when those agreements concealed that the petition was a VAWA self-petition requiring allegations of battery or extreme cruelty by the client's own U.S. citizen family member, that the retainer created no meaningful attorney-client relationship, and that all work would be performed by

non-attorneys without meaningful review;

d. *§ 17.46(b)(24) — Failure to disclose material information.* Failing to disclose information that Defendants knew at the time of the transaction, when such failure was intended to induce consumers into transactions they would not have entered had the information been disclosed, specifically: (i) that the only immigration pathway being offered was a VAWA self-petition; (ii) that the petition required allegations of battery or extreme cruelty by the client's own U.S. citizen family member; (iii) that filing a materially false VAWA petition exposes the petitioner to federal criminal liability under 18 U.S.C. § 1546, removal proceedings, and permanent bars to future immigration benefits; (iv) that all substantive client interactions would be conducted by non-attorney sales representatives; and (v) that the client's personal declaration would be fabricated by a non-attorney "creative writer" who would have no contact with the client.

e. *False Statistical Representations in Commercial Solicitation* (Tex. Bus. & Com. Code §§17.46(b)(5), (b)(7), and (b)(24)): On November 12, 2025, Defendant Frances Meneses published a TikTok video in which she falsely attributed to USCIS publications a 91% to 92% VAWA approval rate. As alleged above, no USCIS publication contains or supports that figure. Published USCIS data shows spousal VAWA approval rates of approximately 70% and parent-based approval rates of approximately 23% for the most recent available reporting period. The video simultaneously mischaracterized U visa and T visa prospects as carrying a "50% chance of winning," ignoring that U visa issuances are constrained by a

statutory annual cap of 10,000 under 8 U.S.C. §1184(p)(2), a structural allocation limit unrelated to petition merit, and that adjudicated T visa petitions are approved at rates substantially exceeding 50% according to USCIS historical data. These representations constitute: (i) false statements of fact about the characteristics and outcomes of Defendants' VAWA services in violation of §17.46(b)(5); (ii) false comparative representations designed to disparage competing immigration remedies (U visa, T visa) and misrepresent Defendants' relative advantage in violation of §17.46(b)(7); and (iii) misleading advertising likely to deceive the public in violation of §17.46(b)(24). Class Members who were influenced by these false statistics, whether by direct viewing of the video or through word-of-mouth repetition within the Spanish-speaking immigrant community, detrimentally relied on a materially false representation of a characteristic of Defendants' services.

251. Defendants engaged in an unconscionable action or course of action within the meaning of Tex. Bus. & Com. Code § 17.50(a)(3) by taking advantage of the lack of knowledge, ability, experience, and capacity of Plaintiff and class members to a grossly unfair degree.

252. Defendants deliberately targeted undocumented, predominantly Spanish-speaking immigrants with limited formal education, limited English proficiency, and no familiarity with the American legal system or federal immigration law.

253. Defendants exploited that vulnerability through a systematic course of conduct that included:

   a. designing marketing materials exclusively in Spanish to maximize reach among

monolingual immigrants while presenting all legal documents exclusively in English;

b. deploying the culturally encoded honorific "licenciada" to induce Spanish-speaking clients to believe they were receiving advice from licensed attorneys;

c. instructing all client-facing staff to avoid using the word "VAWA" in order to prevent clients from independently investigating the nature of the filing being made on their behalf;

d. implementing commission-and-quota structures that rewarded enrollment volume over eligibility screening, ensuring that clients' fundamental interests were subordinated to Defendants' revenue objectives; and

e. rushing clients through electronic document signing in English during brief telephone calls, knowing that clients lacked the language capacity, technical knowledge, and opportunity to understand what they were signing.

254. Each of the deceptive acts and practices and each element of Defendants' unconscionable course of action described above was a producing cause of actual damages to Plaintiff and class members, including:

a. fees paid in reliance on Defendants' misrepresentations and omissions; ongoing contractual payment obligations entered into as a result of Defendants' concealment;

b. costs of retaining successor counsel to review and remediate Defendants' filings;

c. costs of remediating fraudulent VAWA petitions; and

    d. exposure to federal criminal liability and adverse immigration consequences arising from filings Plaintiff and class members did not knowingly authorize.

255. Defendants' violations of the DTPA were committed knowingly and intentionally within the meaning of Tex. Bus. & Com. Code § 17.45(9) and (13).

256. Defendants had actual awareness at the time of the transactions that:

    a. their marketing materials omitted any reference to VAWA and misrepresented the nature of the services being sold;

    b. the term "licenciada" would be understood by Spanish-speaking clients as designating a licensed attorney;

    c. their standardized retainer agreements concealed the VAWA nature of the petition, the abuse-allegation requirement, and the criminal exposure created by a false filing; and

    d. their deliberate policy of prohibiting staff from using the word "VAWA" was expressly intended to prevent clients from discovering the nature of the filing being made on their behalf.

257. These violations were not the product of mistake, oversight, or good faith. They were deliberate business policies designed by Frances Christine Meneses and implemented firm-wide through training, scripting, supervision, and the threat of termination.

258. Pursuant to Tex. Bus. & Com. Code § 17.505(a), Plaintiff will provide written notice to Defendants advising them of Plaintiff's specific complaints and the amount of actual damages and expenses prior to or contemporaneously with filing.

259. To the extent the sixty-day notice period has not yet run, Plaintiff requests that the Court

abate this action as to this Count for sixty days pursuant to § 17.505(c) to permit Defendants an opportunity to comply with applicable DTPA obligations.

260. Pursuant to Tex. Bus. & Com. Code § 17.50(b), Plaintiff and class members are entitled to: (a) actual economic damages; (b) because Defendants' violations were committed knowingly, additional damages not to exceed three times the amount of actual damages under § 17.50(b)(1); (c) because Defendants' violations were committed intentionally, additional damages not to exceed three times the amount of actual damages under § 17.50(b)(2); and (d) reasonable and necessary attorney's fees under § 17.50(d).

## VIII.   EXEMPLARY DAMAGES

261. Defendants' conduct was fraudulent, malicious, and grossly negligent. Defendants deliberately designed and implemented a system to exploit vulnerable immigrants for profit, knowing that the system would result in the filing of false documents with federal authorities, expose clients to criminal liability, and deprive clients of the competent legal representation they were paying for.

262. Plaintiff and class members are entitled to exemplary damages under Texas Civil Practice and Remedies Code Chapter 41 in an amount sufficient to punish Defendants for their conduct and deter similar conduct in the future.

## IX.   ELECTION OF REMEDIES

263. Plaintiff reserves the right to elect between RICO treble damages and exemplary damages under Chapter 41 prior to submission to the jury.

264. Plaintiff's claims for treble damages under Count III (Civil RICO, 18 U.S.C. § 1964(c)), additional damages under Count V (Texas Deceptive Trade Practices Act, Tex. Bus. &

Com. Code § 17.50(b)), and exemplary damages under Section VIII (Tex. Civ. Prac. & Rem. Code Chapter 41) each provide independent bases for enhanced or multiplied recovery arising in whole or in part from the same underlying course of conduct.

265. To the extent these enhanced remedies are legally inconsistent and cannot be simultaneously recovered for the same injury, they are pleaded in the alternative pursuant to Federal Rule of Civil Procedure 8(d)(2).

266. Plaintiff expressly reserves the right to elect among these theories of enhanced recovery, and among any other legally inconsistent remedies pleaded in this Complaint, at any time prior to submission to the jury or entry of final judgment, whichever is earlier.

267. The simultaneous pleading of these theories does not constitute an election, a waiver of any theory, or a merger of any remedy, and Plaintiff does not intend by this Complaint to limit enhanced recovery to any single theory until such election is made.

268. For the avoidance of doubt: (a) Plaintiff's election among enhanced damages theories does not affect or limit Plaintiff's right to recover actual damages; (b) fee forfeiture and disgorgement under Count I and restitution under Count II are equitable remedies that are independent of, and not subject to election against, any of the enhanced damages theories described above; and (c) Plaintiff's preferred order of election among enhanced damages theories, if required to state one, is: first, treble damages under 18 U.S.C. § 1964(c); second, additional damages under Tex. Bus. & Com. Code § 17.50(b); and third, exemplary damages under Tex. Civ. Prac. & Rem. Code Chapter 41.

## X.    ATTORNEY'S FEES AND COSTS

269. Plaintiff and class members are entitled to recover reasonable attorney's fees and costs

under multiple independent bases, including: (a) the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c); and (b) the Court's equitable authority in connection with fee forfeiture and disgorgement.

**XI.    JURY DEMAND**

270.    Plaintiff demands a trial by jury on all claims and issues so triable.

**XII.    PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Reyna Angeles Acosta, individually and on behalf of all others similarly situated, respectfully requests that this Court enter judgment in her favor and in favor of the class and against Defendants, and award the following relief:

A.      Actual, economic, and consequential damages in an amount to be determined at trial;

B.      Fee disgorgement and fee forfeiture of all fees paid by Plaintiff and class members to Defendants, including, as to Defendant Robert Victor Torrey, forfeiture of all compensation received by him in connection with his services as nominal signing attorney for Meneses Law, PLLC during the class period, and joint and several liability with co-Defendants for fees paid by members of the Torrey Certification Subclass;

C.      Restitution of all fees paid by Plaintiff and class members under the theory of unjust enrichment and joint and several liability with co-Defendants for all fees paid by members of the Torrey Certification Subclass;

D.      Treble damages, costs, and reasonable attorney's fees under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c);

E.      Actual damages, and additional damages not to exceed three times actual damages for knowing and intentional violations, together with reasonable and necessary attorney's

fees, under the Texas Deceptive Trade Practices Act, Tex. Bus. & Com. Code § 17.50(b) and (d);

F.      Exemplary damages under Texas Civil Practice and Remedies Code Chapter 41;

G.      Pre-judgment and post-judgment interest at the maximum rate allowed by law;

H.      Reasonable attorney's fees and costs of suit;

I.      Certification of the class and subclasses under Federal Rule of Civil Procedure 23;

J.      An order pursuant to Fed. R. Civ. P. 5.2 and the Court's inherent authority sealing from public disclosure the identities, contact information, and immigration status of class members; an order directing the parties and their counsel to maintain the strict confidentiality of class member identities and contact information; and an order prohibiting Defendants from using class membership or participation in this litigation in any communication with government agencies or third parties adverse to class members' interests;

K.      An order requiring Defendants to produce complete client files for all class members;

L.      Plaintiff reserves the right to elect among the enhanced damages remedies described above prior to submission to the jury or entry of final judgment, as set forth in Section IX of this Complaint;

M.      All other and further relief, at law or in equity, to which Plaintiff and the class may be justly entitled.

Respectfully submitted,

**AVANTI LAW GROUP, PLLC**


By: /s/ *Robert Anthony Alvarez, Sr.*
Robert Anthony Alvarez, Sr.                                      Jonathon A. Muñoz

Fed. Bar No. 3961057                      **Law Nerd LLC**
**Avanti Law Group, PLLC**                Fed. Bar No. 3933549
600 28th St. SW                           Texas Bar No. 24124571
Wyoming, MI  49509                        2112 S. Shary Rd., Ste. 13
(616) 257-6807                            Mission, Texas 78572
ralvarez@avantilaw.com                    lawnerdllc@gmail.com

Attorneys for Plaintiff


**CERTIFICATE OF SERVICE**

I hereby certify that on May 16, 2026, I electronically filed the foregoing document with the

Clerk of Court using the CM/ECF system, which will send notification of such filing to all

counsel of record. I further certify that, to the extent any party has not yet appeared in this action,

a copy of the foregoing will be served by certified mail, return receipt requested, or by other

means authorized by the Federal Rules of Civil Procedure.


*/s/ Robert Anthony Alvarez, Sr.*
Robert Anthony Alvarez, Sr.
MI. No. P66954
Fed. Bar No. 3961057